**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| COMMONWEALTH EDISON COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>DAVEY RESOURCE GROUP, INC. and THE DAVEY TREE EXPERT COMPANY,<br><br>Defendants. | ) | Case No. 23-cv-1336<br><br>Hon. Steven C. Seeger |

# MEMORANDUM OPINION AND ORDER

Commonwealth Edison Company provides electricity to homes and businesses throughout Chicagoland. Its electricity flows through a jungle of power lines that provide a canopy of wires wherever you look. The power lines are lethal vines that criss-cross alleys and backyards. They provide life to countless people, but they also can take life away.

Some of ComEd's power lines run above ground level, up by the trees. Power lines and vegetation don't play well together. So ComEd hired a tree-trimming company, Asplundh Tree Expert, LLC, to manage the trees and plants by the power lines. ComEd also signed a deal with Davey Resource Group, Inc. and Davey Tree Expert Company to inspect Asplundh's work and ensure that the wires didn't get crossed with tree branches.

Raul Osornio owned a home in the suburbs, and an inspector from the Village of Addison told him that a large tree in his backyard was dead and needed to come down. Instead of hiring a professional, Osornio decided to do it himself. So he grabbed an aluminum ladder, placed it against the tree, and climbed on up.

Disaster struck. A power line lurked nearby, and thousands of volts flowed through it. Osornio accidentally touched the power line, and the voltage radiated throughout his body. He suffered terrible burns and lost three limbs, but survived.

A courageous friend, Jose Fulgencio, rose to the occasion and rushed to save him. Fulgencio climbed up the ladder, not knowing that it was electrified. He lost his life trying to save his friend.

Osornio and Fulgencio's estate sued ComEd, Asplundh, and the two Davey companies in state court. After four years of litigation, ComEd and Asplundh settled with the plaintiffs, and the settlement extinguished Davey's liability, too.

ComEd later sued Davey in federal court. The gist of the complaint is that ComEd wants Davey to help pay the settlement tab. After more discovery, the parties filed cross motions for summary judgment.

For the reasons below, ComEd's motion for summary judgment is denied, and Davey's motion for summary judgment is granted in part and denied in part.

## Background

Commonwealth Edison Company is a utility company that provides electricity to homes, businesses, and more. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 2 (Dckt. No. 105).

ComEd uses overhead power lines to run electricity from point A to point B. They hang a few dozen feet above the ground, but tall trees could still touch the red-hot power lines. And trees and power lines don't mix well.

ComEd maintains what it calls a "vegetation management program." *Id.* at ¶ 10. The program involves trimming and/or removing the vegetation near power lines. *Id.*

Managing the vegetation is an enormous undertaking. ComEd's program covers more than 66,000 miles of electrical distribution lines, more than twice the distance around Planet Earth. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 40 (Dckt. No. 101). The service area spans 11,400 square miles. *Id.* Millions of trees live along those power lines. *Id.*

Under the vegetation management program, ComEd signed a deal with Asplundh Tree Expert, LLC to perform the trimming and removal of trees. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 11 (Dckt. No. 105). Asplundh agreed to cut and trim trees and follow ComEd's Vegetation Management Guidelines. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 44 (Dckt. No. 101).

ComEd also contracted with Davey Resource Group, Inc. and Davey Tree Expert Company (collectively, "Davey") to inspect Asplundh's work and perform quality assurance. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 14 (Dckt. No. 105); *see also* Master Terms and Conditions for the Purchase of Materials and Services between Davey Resource Group ("Contractor") and Exelon Business Services Company, LLC (Dckt. No. 85-1) (the "Davey-Exelon Agreement").

Basically, Davey checked Asplundh's work to make sure that it complied with ComEd's Vegetation Management Guidelines. *Id.* Davey didn't cut or trim the trees – Davey merely inspected Asplundh's work, and reported deficiencies to ComEd. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 54 (Dckt. No. 101); *see also* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 20 (Dckt. No. 105) ("Davey agreed to perform quality assurance/quality control inspection and auditing work in the vicinity of ComEd overhead power lines.").

If Davey noted a deficiency in Asplundh's work, then ComEd and Asplundh would investigate the issue. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 20 (Dckt. No. 105).

Davey didn't have the final word on whether there was a problem. ComEd could reverse Davey's assessment of a deficiency when it came to Asplundh's work. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 56 (Dckt. No. 101). And if ComEd reversed the deficiency assessment, Asplundh wouldn't have to redo its work. *Id.* at ¶ 57.

In November 2016, Asplundh did vegetation management for an overhead power line that went over a few buildings, including a house at 45 E. Normandy Drive in Addison, Illinois. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 23 (Dckt. No. 105).

A month later, in December 2016, Davey reviewed Asplundh's work on the overhead power line in that neighborhood. *Id.* at ¶ 25. Davey did not note any deficiencies for any of the trees at 45 E. Normandy Drive. *Id.* at ¶¶ 27–28.

Raul and Gladys Osornio owned that particular piece of property. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 4 (Dckt. No. 101). They lived there for over a decade, before moving to Georgia in 2016. *Id.* They moved before Asplundh did the inspection. After moving, they rented the Addison house to tenants. *Id.*

On February 2, 2017, a property inspector from the Village of Addison met with Raul Osornio at the Addison house for an inspection. *Id.* at ¶ 6. The inspector identified thirteen violations of the Village's property code. *Id.*

One of the violations involved a tree in his backyard. *Id.* at ¶ 7. The tree was a 40-foot-tall Norway spruce. *Id.* at ¶ 8. The tree was one of four trees in a row along the edge of the yard, along with two other Norway spruces and a pine tree. *Id.* at ¶ 9. For about 20 years, the tree was at or above the height of a ComEd power line running through the backyard. *Id.*

But the Village inspector believed that the tree was dead, and that's a property code violation. *Id.* at ¶ 7. So the inspector directed the Osornios to have the tree removed. *Id.* The inspector's official citation did not mention the ComEd power line. *Id.* at ¶ 10.

The inspector told Raul Osornio that he had to cure the property code violations – including the removal of the dead tree – by March 6, 2017, or he would get fined $500. *See* Defs.' Ex. K, Pl.'s Resp. to Defs.' Req. for Admis., at No. 122 (Dckt. No. 105-11). The Osornios missed that deadline, but got an extension until the end of March. *Id.* at No. 123.

Raul Osornio thought that it would be too expensive to hire a professional to remove the tree.[1] *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 20 (Dckt. No. 101). So he decided to remove the tree himself, with help from friends and family. *Id.* But he didn't have any experience removing trees, and neither did his friends or family. *Id.*

Anyone who has ever cut down a large tree knows that it's no small task. And it's not for the faint of heart. Trees are big, tall, and heavy. They like where they're planted, and they don't want to come down. They put up resistance, even when dead.

To fall, trees need some encouragement from a chain saw. It's striking how much a tree will resist even the most determined teeth of a running chain saw. They eventually fall, but not without putting up a fight. The fall itself creates risk and unpredictability. Anytime you're dealing with weight, height, a chainsaw, and unpredictability, bad things can happen.

Cutting down a big tree is dangerous business. Cutting down a big tree by a power line is more dangerous.

---

[1] Apparently, Raul Osornio knew that ComEd would pay for necessary tree removals, and that ComEd would send a contractor to handle unnecessary tree removals (for a fee). *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 18–19 (Dckt. No. 101).

Even so, Raul Osornio believed that he was up to the task. So he drove all the way from Georgia, and decided to cut down the tree himself. *Id.* at ¶ 21.

On March 28, 2017, Osornio met up with a few people at the house, including his father-in-law, his wife's uncle, and his cousin. *Id.*

Jose Fulgencio, Osornio's friend, came by the Addison house, too. *Id.* at ¶ 32. But Fulgencio wasn't there to help remove the tree. *Id.* He came to visit the group and bring them some coffee. *Id.*

Raul Osornio got to work. He leaned an aluminum extension ladder against the tree, and climbed to the top. *Id.* at ¶¶ 23–25. He used a rope to tie himself to the ladder, and tied the ladder to the tree. *Id.* at ¶ 25. He planned to pull a chainsaw up to himself on another rope, and use the chainsaw on the tree. *Id.* at ¶ 26.

The tree was next to the power line, which meant that Osornio was next to the power line. The parties disagree about exactly how close the power line was to the tree. *Id.* at ¶ 27. But whatever the gap was, it was too close.

The unspeakable happened. Osornio's head and back touched the power line. He was electrocuted. *Id.* at ¶¶ 28–31.

To make matters worse, Osornio was tied to the tree, standing on an aluminum ladder. And an aluminum ladder conducts electricity. So Osornio was 20 feet in the air with nowhere to go, getting shocked over and over again by the power line and the ladder. *Id.*

Fulgencio saw what was happening, and to his eternal credit, he sprang into action to help his friend. In a selfless act of valor, he tried to do something. He climbed up the aluminum ladder to grab Osornio. *Id.* at ¶¶ 33–34.

But the ladder was electrified. Fulgencio was electrocuted, and didn't survive. *Id.* at ¶ 34.

Osornio survived, but was severely burned. *Id.* at ¶ 30. The doctors had to partially amputate both of his arms and one of his legs. *Id.*

The Osornios and the estate of Fulgencio each sued ComEd in two separate lawsuits in state court. *Id.* at ¶¶ 66–67. Before long, they amended the complaints and added Asplundh and Davey as defendants. *Id.* at ¶ 69.

Discovery began. The parties identified over 70 potential witnesses, including fact witnesses, electrical safety experts, damages experts, medical experts, and more. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶¶ 37–38, 43–46 (Dckt. No. 105). The parties explored a number of contested issues.

One of the issues involved whether the tree needed to come down at all. ComEd's manager of vegetation management (Kevin Jury) assessed the tree after the accident. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 62 (Dckt. No. 101). He testified that the tree wasn't a hazard or a threat. In his view, the tree did not need to be reported, and did not violate ComEd's guidelines. Other witnesses disagreed, and testified that the tree posed a danger. *Id.*

Another issue involved whether the power lines were visible. Raul Osornio testified that he didn't see the ComEd power lines, even though he knew that there were overhead power lines in the backyard. *See* Pl.'s Ex. 1, Raul Osornio Dep., at 58:12 – 59:5, 154:9 – 157:12 (Dckt. No. 101-1). But other witnesses – including firefighters, police officers, ComEd employees, and people present during the accident – testified that the power lines were clearly visible. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 36 (Dckt. No. 101).

After four years of litigation in state court, ComEd reached settlements with the Osornios and with the estate of Fulgencio. *Id.* at ¶ 73. But the settlements covered more than ComEd. The Osornios and the estate of Fulgencio agreed to settle all claims against ComEd, Asplundh, Davey, and any other potential defendants, in exchange for payments from ComEd and Asplundh. *Id.*

But that wasn't the end of it.

About a year after the settlements, ComEd filed suit against Davey in federal court. *See generally* Cplt. (Dckt. No. 1). Basically, ComEd wants Davey to help pay the settlement tab.

ComEd brings three claims against Davey: (1) contractual indemnity; (2) breach of contract; and (3) contribution under the Illinois Contribution Among Joint Tortfeasors Act, 740 ILCS 100 *et seq*. *See* Third Am. Cplt., at ¶¶ 42–58 (Dckt. No. 85).

After discovery, the parties filed cross motions for summary judgment. ComEd filed a motion for partial summary judgment on the contractual indemnity claim (only). *See generally* Pl.'s Mtn. for Partial Summ. J. (Dckt. No. 93). Davey filed a motion for summary judgment on all three claims. *See generally* Defs.' Mtn. for Summ. J. (Dckt. No. 97).

## Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

**Analysis**

ComEd brings three claims against Davey, including two contract claims and a tort claim.

The first claim is an indemnification claim, alleging that the contract requires Davey to indemnify ComEd for the accident. The second claim is a breach-of-contract claim about Davey's performance under the contract. The third claim is a tort claim for contribution as a joint tortfeasor.

Before diving in, the Court needs to do a little housekeeping and tidy up the analysis for Count II and Count III. Again, Count II is a contract claim, and Count III is a tort claim. The claims cover different areas of the law, but they involve similar terminology. Each claim involves the issue of foreseeability.

The parties lumped both counts together and framed their discussion around proximate causation. *See, e.g.*, Defs.' Mem. in Supp. of Defs.' Mtn. for Summ. J., at 3–11 (Dckt. No. 99);

Pl.'s Mem. in Opp'n to Defs.' Mtn. for Summ. J., at 15–19 (Dckt. No. 100). That framing misses the mark.

"[P]roximate cause is a tort concept, not an element of a contract claim." *See Sports Arena Mgmt., Inc. v. K & K Ins. Grp., Inc.*, 2008 WL 4877452, at *6 (N.D. Ill. 2008). Causation does come into play in a breach-of-contract claim. But the causation inquiry is different between contracts and torts. *See generally* 11 Corbin on Contracts § 56.14 (2026) (comparing foreseeability and causation between contracts and torts).

In a breach-of-contract claim, damages must be "caused by th[e] breach." *See Ivey v. Transunion Rental Screening Sols., Inc.*, 215 N.E.3d 871, 878 (Ill. 2022). A plaintiff can only recover damages that were foreseeable at the time of contract formation. *See Hadley v. Baxendale*, 9 Ex. 341, 354, 156 Eng. Rep. 145, 151 (1854) ("Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, *i.e.,* according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it.").

The case law uses all sorts of synonymous phrases to describe the same underlying principle. Unless the parties agree otherwise, a party can only recover foreseeable damages for a breach of contract. *See* 11 Corbin on Contracts § 56.14 (2026) ("In contract, damages are limited to those that the defendant had reason to foresee when the contract was made . . . ."); *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 515 N.E.2d 61, 67 (1987) ("[A]ll damages which naturally and generally result from a breach are recoverable."); *Schroeder v. Barth, Inc.*, 969 F.2d 421, 425 (7th Cir. 1992) ("Ever since *Hadley v. Baxendale*, courts have allowed

recovery in breach of contract actions for all damages that were reasonably foreseeable to the parties at the time of contract formation.”). Foreseeability plays a role in breach-of-contract claims because it limits the amount of recoverable damages.

For tort claims, the causation analysis sounds similar, but it is not the same. Under tort law, causation comes into play at the liability stage. That is, a defendant’s conduct must have caused someone’s injury. Causation in torts includes both but-for causation and proximate causation (also known as legal cause). In turn, proximate causation turns on the foreseeability of a victim’s injury based on a defendant’s conduct.

In a tort case, foreseeability limits *causation*, not *damages*. Indeed, under the familiar “eggshell-skull” rule, so long as the *type* of harm is foreseeable, the *extent* of harm need not be. *See Knauerhaze v. Nelson*, 836 N.E.2d 640, 657 (Ill. 2005) (“[A]lthough legal cause is generally defined by foreseeability, it is also said that the extent of the harm . . . need not be foreseeable.”) (internal citations omitted).

In other words, unlike in contracts, a tort defendant may be on the hook for unforeseeable damages. “Because the conduct of a reasonably prudent person depends upon what is foreseeable, the fact of negligence is determined by the test of foreseeability. But having thus established that the conduct of the defendant was negligent, the wrongdoer is often compelled to pay damages for unforeseeable injuries.” *See* 11 Corbin on Contracts § 56.14 (2026).

“Thus, the limitation of damages for breach of contract to injuries that the defendant had reason to foresee when the contract was made is not identical to the rule that is often given as applicable in actions for damages for a tort.” *Id.*; *see also Evra Corp. v. Swiss Bank Corp.*, 673 F.2d 951, 958 (7th Cir. 1982) (“The rule of *Hadley v. Baxendale* links up with tort concepts in another way. The rule is sometimes stated in the form that only foreseeable damages are

recoverable in a breach of contract action. So expressed, it corresponds to the tort principle that limits liability to the foreseeable consequence of the defendant's carelessness.") (Posner, J.).

In tort law, foreseeability plays a role on the issue of *liability*. A defendant is liable for injuries proximately caused by his or her negligence, meaning injuries that a reasonable person would foresee as a likely and natural result of the conduct.

In contract law, foreseeability plays a role on the issue of *damages*. A plaintiff can recover damages that are a natural and foreseeable result of a breach.

Sometimes the standards for torts and contracts get blurred and blended together in the case law. Analytical lines can get crossed by using the wrong terminology.

The Seventh Circuit itself has mixed the two standards (at least once, anyway). *See In re Emerald Casino, Inc.*, 867 F.3d 743 (7th Cir. 2017). In *Emerald Casino*, the Seventh Circuit addressed causation in breach-of-contract claims under Illinois law. The Court of Appeals heavily relied on the Illinois Supreme Court's decision in *Turcios v. DeBruler Co.*, 32 N.E.3d 1117 (Ill. 2015). *See, e.g., Emerald Casino*, 867 F.3d at 755–57 (citing *Turcios* eight times).

But *Turcios* wasn't a breach-of-contract case. It was a tort case. The Illinois Supreme Court analyzed causation in the context of wrongful death and survival actions. *See Turcios*, 32 N.E.3d at 1120.

So, the Seventh Circuit in *Emerald Casino* incorrectly injected torts language and analysis into a breach-of-contract claim. The Seventh Circuit discussed "cause in fact and legal cause." *See Emerald Casino*, 867 F.3d at 755–57. That's the domain of tort law, but those concepts have no home in contract law.

In a similar vein, some courts have injected confusion by using the lingo of "proximate cause" when discussing breach-of-contract damages. *See, e.g.*, *Scholle IPN Packaging, Inc. v.*

*Valfilm, LLC*, 2019 WL 3555051, at *6 (N.D. Ill. 2019). The *Scholle* court said that "[d]amages not *proximately caused* by the defendant's breach are generally not allowed." *Id.* (emphasis added) (citing *In re Illinois Bell Tel. Link-Up II*, 994 N.E.2d at 558). The *Scholle* opinion cites *In re Illinois Bell Telephone*, which provides that "[d]amages which are not the *proximate cause* of the breach are not allowed." *See In re Illinois Bell Tel. Link-Up II*, 994 N.E.2d at 558 (emphasis added) (citing *Feldstein v. Guinan*, 499 N.E.2d 535, 537 (Ill. App. Ct. 1986).

In turn, *In re Illinois Bell Telephone* cites *Feldstein*. But *Feldstein* does not use the term "proximate cause." Instead, *Feldstein* counsels that "[s]peculative damages or damages not the *proximate result* of the breach will not be allowed." *See Feldstein*, 499 N.E.2d at 537 (emphasis added).

The phraseology might seem like a small thing, but sometimes a small thing can lead to a big change. By changing "proximate result" to "proximate cause," *Feldstein* migrated from the land of contract to the land of tort.

The case at hand involves both the foreseeability of damages under contract law, and proximate causation under tort law. They sound similar, but they're separate concepts, so it's best to keep them separated.

With that framing in mind, this Court will dive in. The Court will start with the breach-of-contract claim (Count II), and then will turn to the tort claim (Count III). The indemnification claim (Count I) will consume the most attention, so it will come last.

## I. Breach of Contract (Count II)

The breach-of-contract claim is about Davey's performance under the contract. Again, Davey didn't do the cutting or the trimming. Instead, Davey inspected the work of Asplundh.

ComEd alleges that Davey breached the contract at least 19 different ways. *See* Third Am. Cplt., at ¶ 50 (Dckt. No. 85). For example, ComEd alleges that Davey failed to spot the need for the tree to come down. *Id.* As ComEd sees things, if Davey had identified the tree as dangerous and taken appropriate action, then the accident would not have happened.

As damages, ComEd seeks the amount of the settlement that it reached with Osornio and with the estate of Fulgencio. According to ComEd, the harm was a foreseeable result of Davey's failure to do its job and live up to its end of the bargain.

Under Illinois law, a breach-of-contract claim has four elements. A plaintiff must establish "(1) the existence of a valid and enforceable contract, (2) substantial performance by the plaintiff, (3) breach by the defendant, and (4) damages caused by that breach." *See Ivey v. Transunion Rental Screening Sols., Inc.*, 215 N.E.3d 871, 878 (Ill. 2022); *see also Ozkan v. Loyola Univ. Med. Ctr.*, 2009 WL 10691158, at *7 (N.D. Ill. 2009). "Only a duty imposed by the terms of a contract can give rise to a breach." *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. Ct. 2004).

Damages are an essential element. If a plaintiff cannot prove damages, then the breach-of-contract claim fails. *See Kulhanek v. Casper*, 232 N.E.3d 1101, 1110 (Ill. App. Ct. 2023) ("Damages are an essential element of plaintiffs' breach of contract claim, which they must prove in order to prevail."); *In re Illinois Bell Tel. Link-Up II*, 994 N.E.2d 553, 558 (Ill. App. Ct. 2013) ("Damages are an essential element of a breach of contract action and a claimant's failure to prove damages entitles the defendant to judgment as a matter of law."); *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 631 (7th Cir. 2007) ("Therefore, under Illinois law, it is necessary to show damages – not the specific amount, but rather that the plaintiff did, in fact, suffer some damages.").

A plaintiff cannot recover any and all damages flowing from a breach. Instead, a plaintiff can only recover damages that were foreseeable at the time of contract formation. *See Hadley v. Baxendale*, 9 Ex. 341, 354, 156 Eng. Rep. 145, 151 (1854). Foreseeability provides a limiting principle for damages in a breach-of-contract case.

Courts use several synonymous phrases to describe this foreseeability principle. "Only foreseeable damages are recoverable for a breach of contract, and the foreseeability of damages is considered at the time the parties entered into the contract." *See Contempo Design, Inc. v. Chicago & N.E. Ill. Dist. Council of Carpenters*, 226 F.3d 535, 553 (7th Cir. 2000) (internal citation omitted). "Recoverable damages are restricted to 'those which were reasonably foreseeable and were within the contemplation of the parties at the time the contract was executed.'" *Abellan v. Lavelo Prop. Mgmt., LLC*, 948 F.3d 820, 831 (7th Cir. 2020) (quoting *Kalal v. Goldblatt Bros., Inc.*, 368 N.E.2d 671, 674 (Ill. App. Ct. 1977)).

"Under Illinois law, a party seeking damages for breach of contract must show 'that the alleged breach is the cause of those damages, with reasonable certainty.'" *Ozkan*, 2009 WL 10691158, at *12 (quoting *TAS Distrib. Co.*, 491 F.3d at 633); *see also Antrim Pharms. LLC v. Bio-Pharm, Inc.*, 310 F. Supp. 3d 934, 944 (N.D. Ill. 2018) (same); *Ivey v. Transunion Rental Screening Sols., Inc.*, 186 N.E.3d 1076, 1085 (Ill. App. Ct. 2021) ("While absolute certainty is not required, the plaintiff must prove damages with reasonable certainty without resort to conjecture or speculation.").

Put another way, "the plaintiff may recover damages which 'naturally and generally result from [the] breach.'" *See Unicus Performance Training, LLC v. Johnson*, 20211 WL 10088338, at *3 (Ill. App. Ct. 2011) (alteration in original) (quoting *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 515 N.E.2d 61, 67 (Ill. 1987)); *see also Garcia v. Fitzgerald*, 2024

WL 4182869, at *6 (Ill. App. Ct. 2024) ("Regarding damages, the plaintiff must allege recoverable damages that 'naturally and generally result' from a breach."). "[R]ecoverable damages are those which naturally result from the breach, or are the consequence of special or unusual circumstances which are in the reasonable contemplation of the parties when making the contract." *Doe v. Roe*, 681 N.E.2d 640, 650 (Ill. App. Ct. 1997).

"A contracting party is generally expected to take account of those risks that are foreseeable at the time he makes the contract. He is not, however, liable in the event of breach for loss that he did not at the time of contracting have reason to foresee as a probable result of such a breach. The mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable." *See* Restatement (Second) of Contracts § 351 (2024 Update).

To sum it up, a plaintiff can recover damages that were a natural and foreseeable result of the defendant's breach of contract. Generally speaking, damages are not recoverable unless they were foreseeable at the time of contract formation. "The question asked is whether a reasonably prudent person in the position of the breaching party, at the time the parties entered into the contract, would have considered these damages to be the natural consequence of this type of breach." *Contempo Design*, 226 F.3d at 555.

Here, Asplundh agreed to trim and remove trees that posed a problem for the power lines. And Davey agreed to inspect Asplundh's work and make sure that it complied with ComEd's Vegetation Management Standards.

It is foreseeable that shoddy work by Asplundh could lead to problems. A tree, or even a limb, could fall and sever a power line, especially during storms. If you've ever lost power during a storm, a tree might have had something to do with it.

A tree could cause a power outage, or a fire, or who-knows-what. A tree could fall and snap a powerline, creating a risk of electrocution. Vines and other vegetation could conduct electricity, too, posing a danger to anyone walking nearby. Basically, it's hard to think of anything good that could come from a tree or other vegetation touching a power line.

Davey played an important role in preventing those inconvenience and calamities. As the inspector, Davey provided a second line of defense, and ensured that problematic trees received proper care and attention.

If Davey botched an inspection, and failed to catch shoddy work by Asplundh, then dangers could continue to linger in the neighborhood. Festering problems could lead to bigger problems. It is foreseeable that a dead tree could fall and damage a power line.

A reasonable jury could conclude that a failure by Davey to catch faulty work by Asplundh could allow problems to linger. But it is not foreseeable that a shoddy inspection would lead a do-it-yourselfer to climb a ladder, try to cut down the tree by himself, and get electrocuted.

When they hatched the contract, Davey and ComEd could have foreseen that faulty inspection work by Davey could create problems and impose costs. But a horrific accident involving self-help tree removal wasn't on anyone's contractual bingo card.

Osornio and Fulgencio suffered terrible injuries. But no reasonable jury could conclude that those injuries were a natural, foreseeable result of a breach by Davey at the time of contract formation. If the accident wasn't foreseeable, then a settlement for the accident wasn't foreseeable, either.

The damages were not foreseeable, so this Court grants summary judgment to Davey on the breach-of-contract claim.

## II. Contribution (Count III)

The next claim is a tort claim. ComEd seeks contribution from Davey under the Illinois Contribution Among Joint Tortfeasors Act. *See* 740 ILCS 100 *et seq*.

The substance of the claim has a familiar ring. ComEd repeats the same 19 allegations that it made in the breach-of-contract claim. By and large, ComEd alleges that Davey botched the inspection and failed to notice that the tree was dead and needed to come down. *See* Third Am. Cplt., at ¶¶ 55–58 (Dckt. No. 85).

ComEd alleges that it shares "common tort liability" with Davey. *Id.* at ¶ 51. So ComEd claims that Davey must pay its pro-rata share of the settlement as a joint tortfeasor.

The Contribution Act allows one tortfeasor to recover from another tortfeasor when they share liability. Under Section 2 of the statute, "where 2 or more persons are subject to liability in tort arising out of the same injury to person or property, or the same wrongful death, there is a right of contribution among them." *See* 740 ILCS 100/2(a). Basically, the statute is a way for one tortfeasor to make another tortfeasor help carry the load.

The Contribution Act comes into play only when both parties are tortfeasors. Each party must be "subject to liability in tort." *Id.*; *see also People ex rel. Dept. of Labor v. Valdivia*, 955 N.E.2d 631, 635 (Ill. App. Ct. 2011) ("[T]o state a claim under the Contribution Act, a party must show that both he and the party from whom he seeks contribution are subject to liability in tort for the injury suffered by the plaintiff in the underlying suit.").

Davey argues that it has no liability under the Contribution Act because it isn't a tortfeasor at all. As Davey sees things, the evidence could not support a finding of negligence by a reasonable jury.

Under Illinois law, negligence requires "[1] a duty owed by the defendant to the plaintiff, [2] a breach of that duty, and [3] an injury [4] proximately caused by the breach." *See Scott v. Wendy's Properties, LLC*, 131 F.4th 815, 819 (7th Cir. 2025) (quoting *Johnson v. Armstrong*, 211 N.E. 355, 371 (Ill. 2022)) (alterations in original).

For present purposes, the key issue is causation. Causation "encompasses two distinct requirements: cause in fact and legal cause." *See Young v. Bryco Arms*, 821 N.E.2d 1078, 1085 (Ill. 2004).

Sometimes the terminology can get in the way and cause a little trouble. Most of the time, proximate causation is another name for legal cause (not cause in fact), meaning that it is a subset of the broader causation inquiry.

But Illinois courts sometimes use "proximate cause" more broadly as an umbrella term, covering both factual cause and legal cause. *See, e.g.*, *Young*, 821 N.E.2d at 1085 ("The term 'proximate cause' encompasses two distinct requirements: cause in fact and legal cause."); *Lee v. Chicago Transit Auth.*, 605 N.E.2d 493, 502 (Ill. 1992) ("The term 'proximate cause' describes two distinct requirements: cause in fact and legal cause, which is a policy decision that limits how far a defendant's legal responsibility should be extended for conduct that, in fact, caused the harm.").

That's potentially confusing, because cause in fact and legal cause are different concepts. They play a different role in the causation analysis. When it comes to cause in fact, the question is whether Y would have happened without X. When it comes to proximate causation, the question is whether Y is a natural and foreseeable consequence of X.

For the sake of simplicity, this Court will use the term "proximate causation" in a more limited sense to cover only legal causation (not cause in fact). That is, this Court will use the term proximate cause and legal cause interchangeably.

"The first requirement, cause in fact, is present 'when there is a reasonable certainty that a defendant's acts caused the injury or damage.' In deciding this question, we first ask whether the injury would have occurred absent the defendant's conduct." *Id.* (quoting *Lee v. Chicago Transit Auth.*, 605 N.E.2d 493, 502 (Ill. 1992)).

"When considering cause in fact, courts generally employ either the traditional 'but for' test or the 'substantial factor' test." *Turcios v. DeBruler Co.*, 32 N.E.3d 1117, 1124 (Ill. 2015). "Under the 'but for' test, a defendant's conduct is not the cause of an event if the event would have occurred without it. Under the 'substantial factor' test, the defendant's conduct is said to be a cause of an event if it was a material element and a substantial factor in bringing the event about." *Id.* (cleaned up).

The second requirement, legal cause, is more difficult to pin down. "A firm definition for the term 'proximate cause' has escaped judges, lawyers, and legal scholars for centuries." *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 392 (7th Cir. 2018); *see also Paroline v. United States*, 572 U.S. 434, 444 (2014) ("The idea of proximate cause, as distinct from actual cause or cause in fact, defies easy summary.").

Proximate causation "reflects the reality that the judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014) (quotation marks omitted). "The purpose of the proximate causation requirement . . . is to avoid speculative recovery by requiring a direct

relation between the plaintiff's injury and the defendant's behavior." *Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735, 743 (7th Cir. 2018).

Legal cause is "'largely a question of foreseeability' that answers if 'the injury is of a type that a reasonable person would see *as a likely result* of his or her conduct.'" *See Scott*, 131 F.4th at 819 (quoting *Abrams v. City of Chicago*, 811 N.E.2d 670, 675 (Ill. 2004)) (emphasis in original); *see also In re Boeing 737 MAX Pilots Litig.*, 638 F. Supp. 3d 838, 851 (N.D. Ill. 2022) (explaining that the "injury suffered by the plaintiff must be the natural and not merely a remote consequence of the defendant's act").

"Courts ask whether the injury is the type of injury that a reasonable person would see as a 'likely result' of his or her conduct, or whether the injury is so 'highly extraordinary' that imposing liability is not justified." *Turcios*, 32 N.E.3d at 1124. "For an act to be the proximate cause of a harm, 'the injury suffered by the plaintiff must be the natural and not merely a remote consequence of the defendant's act.'" *In re Boeing*, 638 F. Supp. 3d at 852 (quoting *Martin v. Heinold Commodities, Inc.*, 643 N.E.2d 734, 746 (Ill. 1994)); *see also United States v. Laraneta*, 700 F.3d 983, 990 (7th Cir. 2012) ("The conventional definition of proximate cause was and remains that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred.").

Relevant considerations include "foreseeability, directness, and the substantiality of the defendant's conduct." *See Kemper*, 911 F.3d at 392; *see also Turcios*, 32 N.E.3d at 1124 (noting that "legal cause involves an assessment of foreseeability"). A defendant is not liable for injuries that are "too remote," "purely contingent," or "indirect[ ]." *See Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992). The proximate-cause requirement "normally eliminates the bizarre." *See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 536 (1995).

"Proximate causation requires a close connection between the act and the injury, with a natural link between the two. Under Illinois law, proximate cause 'is established only if the defendant's conduct is so closely tied to the plaintiff's injury that he should be held legally responsible for it.'" *In re Boeing*, 638 F. Supp. 3d at 853 (quoting *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1127 (Ill. 2004)).

"The greater the separation between the conduct and the injury, the less likely that proximate causation can bridge the gap. In some sense, all things are connected. But the law places limits on the ability to blame others for losses." *Id.* "A requirement of proximate cause thus serves, *inter alia*, to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity." *See Paroline*, 572 U.S. at 445.

"Proximate causation is reminiscent of the well-known 'butterfly effect.' Under chaos theory, maybe the flapping of butterfly wings can, in some small way, influence a storm. But we don't hold butterflies liable for hurricanes." *In re Boeing*, 638 F. Supp. 3d at 853. Or, as Justice Scalia colorfully put it: "Life is too short to pursue every human act to its most remote consequences; 'for want of a nail, a kingdom was lost' is a commentary on fate, not the statement of a major cause of action against a blacksmith." *Holmes*, 503 U.S. at 287 (Scalia, J., concurring in the judgment).

Proximate causation turns on foreseeability. "Foreseeability means that which it is *objectively reasonable* to expect, not merely what might conceivably occur." *Am. Nat. Bank & Trust Co. of Chicago v. Nat'l Advert. Co.*, 594 N.E.2d 313, 320 (Ill. 1992) (citation omitted) (emphasis in original). So there is no legal causation if "the intervening efficient cause was [not]

of a type that a reasonable person would see as a likely result of his or her conduct."[2] *See First Springfield Bank & Trust v. Galman*, 720 N.E.2d 1068, 1072 (Ill. 1998).

Maybe Mrs. O'Leary behaved negligently when she placed a burning lantern next to her cow and a pile of hay in her barn in 1871. But proximate causation would stand in the way of holding Mrs. O'Leary liable for the ensuing incineration of the city in the Great Chicago Fire.

An intervening act can break the chain of proximate causation. "The negligence of a defendant will not constitute a proximate cause of a plaintiff's injuries if some intervening act supersedes the defendant's negligence, but if the defendant could reasonably foresee the intervening act, that act will not relieve the defendant of liability." *Bentley v. Saunemin Twp.*, 413 N.E.2d 1242, 1245 (Ill. 1980). A "'superseding cause' is a natural force or act of a third party that intervenes between the defendant's tortious conduct and the injury at issue to absolve the defendant of liability. In such a situation, both the tortious aspect of the defendant's conduct and the superseding cause are causes in fact of the injury, but for reasons of fairness, the defendant's conduct is no longer considered a legal cause, and the defendant is absolved of liability." *Thomas v. Khoury*, 190 N.E.3d 245, 247 (Ill. 2021).

---

[2] The issue of proximate causation calls to mind another famous case beloved by countless first-year law students. *See Palsgraf v. Long Island R. Co.*, 162 N.E. 99 (1928). There, a railroad conductor helped a struggling passenger board a departing train. The passenger had his hands full and dropped an otherwise-unassuming package. Unbeknownst to the conductor, the package contained fireworks, and when it hit the ground, the fireworks exploded. The pyrotechnic display overturned a set of scales on the platform, which struck Palsgraf. Writing the majority, Judge Cardozo found that the conductor owed no duty of care to Palsgraf, who was standing down the platform. Writing for the dissenters, Judge Andrews framed the issue int terms of proximate causation. "What we do mean by the word 'proximate' is, that because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point. This is not logic. It is practical politics." *Id.* at 103 (Andrews, J., dissenting). Compared to the case at hand, *Palsgraf* was a boom-boom play. That case involved a chain reaction from a single explosion, with little time and distance between the negligence and the injury. But here, months separated the negligence and the accident. And plenty of decisions by other decisionmakers took place in the meantime.

"Causation is a little like a Rube Goldberg machine. It's easy to see but-for causation. Maybe the trap would not have fallen on the mouse unless the ping pong ball had gone down a ramp, entered the bucket, tipped over, pulled a string, pushed a block, knocked down a line of dominoes, and so on. Each step in the chain is essential, so there is but-for causation. But proximate causation places limits on the responsibility of a defendant. It's not reasonably foreseeable that pushing a ping pong ball down a ramp could lead to the trapping of a mouse." *See Exner v. Ebel*, 2026 WL 2410204, at *4 (N.D. Ill. 2026).

Proximate cause "is generally a question of fact." *See Young*, 821 N.E.2d at 1086. But "[u]nder Illinois law, 'the lack of proximate cause may be determined by the court as a matter of law where the facts alleged do not sufficiently demonstrate both cause in fact and legal cause.'" *In re Boeing*, 638 F. Supp. 3d at 851 (quoting *Beretta U.S.A. Corp.*, 821 N.E.2d at 1128).

For now, the Court will set aside whether Davey was a but-for cause of the accident. Cause in fact is one thing, but proximate causation is another. On this record, no reasonable jury could conclude that Davey's actions or omissions proximately caused the accident.

There is too much daylight between Davey's negligence and the accident. Under ComEd's theory, Davey should have spotted the problem with the tree. It was dead, and/or too close to the power lines, and/or climbable, and so on. ComEd thinks that Davey should have issued a deficiency notice.

A deficiency notice would not have guaranteed that Asplundh would have fixed the problem. After all, Asplundh could have pushed back and defended its work. And ComEd might have assessed the situation differently, and concluded that no tree trimming or removal was necessary.

It's possible that the tree would have stayed put, even if Davey had acted differently and sounded an alarm about a potential danger. So maybe Davey's negligence was not the cause in fact of the injury.

At this juncture, this Court will put that possibility to one side. For the sake of argument, this Court will entertain the notion that Asplundh would have taken down the tree if Davey had performed a better inspection.

ComEd's theory is that the tree was not trimmed or removed because of Davey's shoddy work. That's a step toward cause in fact. But it's a mile away from proximate causation.

Maybe the tree stayed put, and remained a danger, because Davey didn't perform an adequate inspection. But lots of steps had to take place before the accident took place.

Under ComEd's theory, the tree still stood because of the shoddy inspection. And because the tree still stood, the Village inspector saw it two months later. And after seeing it, the Village inspector said that it had to come down.

Maybe the tree did, in fact, need to come down. But instead of hiring a professional, or contacting ComEd, Osornio decided to take matters into his own hands. He decided to cut down the tree by himself. And then, he climbed up an aluminum ladder, got too close to the power line, and shocked himself. And then, Fulgencio sprang into action to help his friend, and electrocuted himself.

That's far too attenuated to give rise to proximate causation. It's foreseeable that a faulty inspection could allow trees and vegetation to continue to pose a danger. It's not foreseeable that a faulty inspection could kick off a chain of events culminating in a horrific accident from an unsuccessful effort at do-it-yourself tree removal.

Maybe Davey breached a duty of care when it performed the inspection. But an electrocution after a failed attempt at self-help tree removal was not a natural or foreseeable consequence of any breach.[3]

Plenty of intervening decisions took place in the meantime, too, which breaks any chain of proximate causation. Osornio chose to remove the tree as an amateur instead of hiring a professional. He chose an aluminum ladder, and chose were to put it, and chose where to move, and so on. Osornio's actions were an superseding cause of the accident.

In sum, no reasonable jury could find Davey liable for negligence, because Davey did not proximately cause the injury. If Davey was not negligent, then it was not a tortfeasor. And if Davey was not a tortfeasor, then ComEd has no claim under the Contribution Act.

The Court grants summary judgment to Davey on the tort claim under the Contribution Act.

## III. Indemnification (Count I)

The last remaining claim is an indemnification claim, which is the most complicated claim of the bunch.

In a nutshell, the contract between ComEd and Davey included a provision that required Davey to indemnify ComEd for certain losses. ComEd seeks indemnification under that provision for the settlement payments that it made to Osornio and to the estate of Fulgencio. *See* Third Am. Cplt., at ¶¶ 42–47 (Dckt. No. 85).

The question is whether the settlements fall within the scope of the indemnification provision. *See Kmart Corp. v. Footstar, Inc.*, 777 F.3d 923, 927 (7th Cir. 2015) ("The duty to

---

[3] An antecedent question is whether Davey (as the inspector) owed a duty of care to Osornio (as the homeowner) at all. Negligence require a breach of a duty of care, before getting to the issue of proximate causation. The parties didn't discuss it, so this Court won't reach it.

indemnify only arises where the insured's activity and the resulting damages actually fall within the coverage of the policy.") (citations and internal quotations omitted).[4]

The parties filed cross motions for summary judgment on this issue. ComEd argues that the contract imposes a duty to indemnify, and Davey argues the opposite.

The interpretation of a contract is a question of law. *See U.S. ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632, 645 (7th Cir. 2016); *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014). "Because contracts are interpreted as a matter of law, claims that turn on the interpretation and construction of a contract, rather than on disputed material facts, are suitable for resolution on a motion for summary judgment." *W. Bend. Mut. Ins. Co. v. Procaccio Painting & Drywall Co.*, 928 F. Supp. 2d 976, 981 (N.D. Ill. 2013), *aff'd on other grounds*, 794 F.3d 666 (7th Cir. 2015).

Ordinary rules apply when interpreting indemnification provisions in contracts. *See Buenz v. Frontline Transp. Co.*, 882 N.E.2d 525, 529 (Ill. 2008); *Va. Sur. Co., Inc. v. N. Ins. Co. of N.Y.*, 866 N.E.2d 149, 153 (2007). If the contract is unambiguous, then the plain text controls, and that is the end of the matter. *See Right Field Rooftops, LLC v. Chicago Cubs Baseball Club, LLC*, 870 F.3d 682, 690 (7th Cir. 2017) ("A court must initially look to the language of a contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent.") (quoting *Gallagher v. Lenart*, 874 N.E.2d 43 (2007)); *Utility Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 687 (7th Cir. 2004) ("Under Illinois law . . . contract

[4] There is a second requirement for Davey's liability to ComEd under the indemnification clause: reasonableness of the underlying settlement. Under Illinois law, an indemnitor is liable for an indemnitee's settlement only if the settlement was reasonable. *See Westamerica Mortg. Co. v. TriCounty Reports, Inc.*, 670 F. Supp. 819, 821 (N.D. Ill. 1987); *N.E. Finch Co. v. R.C. Mahon Co.*, 370 N.E.2d 160, 163 (Ill. App. Ct. 1977). Both parties argue over this requirement, too. *See* Pl.'s Mem. in Supp. of Pl.'s Mtn. for Partial Summ. J., at 2–13 (Dckt. No. 94); Defs.' Mem. in Opp'n to Pl.'s Mtn. for Partial Summ. J., at 13–19 (Dckt. No. 104). But because the Court denies summary judgment on Count I on other grounds, the Court will not address whether the underlying settlement was reasonable.

terms are interpreted according to their plain meaning unless otherwise defined."); *Kallman v. Radioshack Corp.*, 315 F.3d 731, 735 (7th Cir. 2002) ("If the language [of the contract] unambiguously answers the question at issue, the inquiry is over.") (citation omitted).

"[T]he threshold issue is whether the contract is ambiguous." *Bright Horizons Children's Ctrs., LLC v. Riverway Midwest II, LLC*, 931 N.E.2d 780, 792 (Ill. App. Ct. 2010) (citation omitted). Illinois courts apply the "four corners rule," meaning that a court should look only at the contract's language to determine if an ambiguity exists. *See Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999).

A contract is ambiguous if it is "susceptible to more than one meaning or is obscure in meaning through indefiniteness of expression." *See Bright Horizons Children's Ctrs.*, 931 N.E.2d at 792 (cleaned up). A contract is not ambiguous, however, just because the parties disagree about what it means. *Id.*; *see also Thompson v. Gordon*, 948 N.E.2d 39, 48 (Ill. 2011). Extrinsic evidence comes into play only if a provision is ambiguous. *See Air Safety*, 706 N.E.2d at 884.

Under Illinois law, "indemnity contracts are to be strictly construed, and any ambiguity in the agreement is to be construed most strongly against the indemnitee." *See Blackshare v. Banfield*, 857 N.E.2d 743, 746 (Ill. App. Ct. 2006). An indemnitee is the party receiving financial protection. In this case, ComEd is the indemnitee.

The agreement between ComEd and Davey included a lengthy, wordy indemnification provision. The key point is that Davey had a duty to indemnify ComEd for losses arising out of certain events. The "Contractor" is Davey, and the "Buyer Party" is ComEd (as an affiliate of Exelon Business Services Company, LLC). It reads:

> Contractor will, to the fullest extent permitted by Law, indemnify, defend upon request, and hold harmless Buyer Parties against all losses, claims, damages, expense (including reasonable attorneys' fees and other defense costs) and liabilities sustained or incurred by the Buyer Parties for any damage, harm, loss or injury of any kind, direct or indirect, to any property or Person (including death), including without limitation, claims for injuries or loss to employees of the Buyer Parties, Contractor and/or any Subcontractor, arising out of any act, omission, conduct, negligence or breach by Contractor Parties and/or arising out of or in any manner associated with the Work under these Terms and Conditions or any contact with or encountering of any property, equipment, vehicles, Sites or personnel of the Buyer Parties, regardless of whether any such liability, damage, loss or injury is alleged to be caused by, result from or arise out of the negligence, fault or other liability of the Buyer Parties or any other party to be indemnified. . . .

*See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 21 (Dckt. No. 105) (emphasis added); *see* Davey-Exelon Agreement, at 1, 7–8 (Dckt. No. 85-1).

That paragraph is a bit of a mouthful, and after a few bites, it's hard to choke down. To make it easier to swallow, the Court will replace "Contractor" and "Buyer Parties" with Davey and ComEd, respectively. Adding some brackets to separate the components might lend a hand and improve readability, too.

With those tweaks, the provision reads:

> [Davey] will, to the fullest extent permitted by Law, indemnify, defend upon request, and hold harmless [ComEd] against all losses, claims, damages, expense (including reasonable attorneys' fees and other defense costs) and liabilities sustained or incurred by [ComEd] for any damage, harm, loss or injury of any kind, direct or indirect, to any property or Person (including death), including without limitation, claims for injuries or loss to employees of [ComEd], [Davey] and/or any Subcontractor, [1] arising out of any act, omission, conduct, negligence or breach by [Davey] and/or [2] arising out of or in any manner associated with the Work under these Terms and Conditions or any contact with or encountering of any property, equipment, vehicles, Sites or personnel of [ComEd], regardless of whether any such liability, damage, loss or injury is alleged to be caused by, result from or arise out of the negligence, fault or other liability of [ComEd] or any other party to be indemnified. . . .

*Id.*

Boiling it down, Davey agreed to indemnify ComEd for losses (1) "arising out of any act, omission, conduct, negligence or breach" by Davey, and/or (2) "arising out of or in any manner associated with the Work under these Terms and Conditions or any contact with or encountering" the people or property of ComEd. *Id.*

A neighboring provision limited the reach of the indemnification provision. That other provision clarified that ComEd would not lose its right to indemnification based on any missteps by ComEd itself, unless ComEd was solely responsible. After replacing "Buyer Party" with ComEd, the provision reads as follows:

> 15.2. Limitations on Indemnity
>
> Except as may be otherwise provided by applicable Law, [ComEd's] right to indemnification will not be impaired or diminished by any act, omission, misconduct, negligence or breach of [ComEd] or any employee or agent of [ComEd] who may be alleged to have contributed thereto and [ComEd's] indemnification right will apply whether or not negligence or liability is alleged in whole or in part against [ComEd] except to the extent it is finally adjudicated that any liability is caused by or resulting from the *sole negligence* of [ComEd] . . . .

*See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 1 (Dckt. No. 112) (emphasis added).

The parties disagree about two key issues. The first issue is whether the accident "ar[ose] out of" or was "in any manner associated with" Davey's work. If so, then Davey must indemnify ComEd. The second issue is whether the duty to indemnify (if any) also requires Davey to indemnify ComEd for ComEd's own negligence.

This Court will take them up, one at a time.

## A. The Duty to Indemnify

The first question is whether the indemnification provision requires Davey to indemnify ComEd for the settlements.

Some parts of the indemnification provision aren't at issue. The parties agree that the victims suffered "damage, harm, loss or injury." *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 21 (Dckt. No. 105) (emphasis added). The parties also agree that ComEd suffered a loss, expense, or liability when it settled the claims with the victims. *Id.*

But the parties do disagree over the meaning and the reach of the phrase "arising out of" and the phrase "associated with." *See* Pl.'s Mem. in Supp. of Pl.'s Mtn. for Partial Summ. J., at 13–19 (Dckt. No. 94); Defs.' Mem. in Opp'n to Pl.'s Mtn. for Partial Summ. J., at 7–13 (Dckt. No. 104); Defs.' Mem. in Supp. of Defs.' Mtn. for Summ. J., at 11, 18–19 (Dckt. No. 99); Pl.'s Mem. in Opp'n to Defs.' Mtn. for Summ. J., at 4–5, 13–15 (Dckt. No. 100).

Again, the contract requires Davey to indemnify ComEd for losses "arising out of any act, omission, conduct, negligence or breach by Contractor Parties and/or arising out of or in any manner associated with the Work under these Terms and Conditions." *Id.*

So, the question is whether ComEd suffered a loss "arising out of" an act or omission of Davey, or "arising out of" or "in any manner associated with" Davey's work under the agreement. *Id.*

The agreement does not define "arising out of" or "associated with," so this Court must look elsewhere to pin down the meaning of those phrases.

A dictionary is a good place to start. The word "arise" means "to originate; to stem (from); [or] to result (from)." *See Arise*, Black's Law Dictionary (12th ed. 2024).

Case law has something to add, too. In general, courts must tread lightly and exercise caution when looking outside a contract to figure out the meaning of what's inside a contract. After all, each contract is different, and the only question is the meaning of the words selected by the parties in a particular contract.

Even so, other cases can "provide guidance for analysis of similar language," even if they "do not involve the precise language in this case." *See Buenz*, 882 N.E.2d at 530 (cleaned up). But "each individual case depends upon the particular language used and the factual setting of the case." *Id.*

When interpreting *statutes*, courts often look to the meaning of the same terminology in other statutes. "When a statutory term is 'obviously transplanted from another legal source,' it 'brings the old soil with it.'" *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019) (citation omitted); *see also* Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527, 537 (1947) ("[I]f a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it.").

A similar principle applies to contracts. Parties enter into contracts against a backdrop of the common law, including the accepted meaning of familiar terminology in the case law. That common-law understanding sheds light on the meaning of contractual provisions. The more common the language, and the more settled the meaning, the more likely it is the same language in a particular contract has the common meaning.

The phrase "arising out of" didn't come out of nowhere. It has a familiar ring to anyone who has spent time in legal circles. It is a bread-and-butter part of insurance law and other areas of the law where a loss is reallocated from one party to another.

The phrase "arising out of" has "been held to mean 'originating from,' 'having its origin in,' 'growing out of' and 'flowing from.'" *See Maryland Cas. Co. v. Chicago and N. W. Transp. Co.*, 466 N.E.2d 1091, 1094 (Ill. App. Ct. 1984) (citations and internal quotations omitted).

The phrase does require "some causal relation," but "[p]roximate causation in the strict legal sense, however, is not required." *See Woodside v. Gerken Food Co.*, 474 N.E.2d 771, 775

(Ill. App. Ct. 1985). "Where a policy includes 'arising out of,' only 'but for causation, not necessarily proximate causation,' will satisfy that language." *See Litterer v. United States*, 545 F. Supp. 3d 625, 638 (N.D. Ill. 2021) (quoting *Maryland Cas. Co.*, 466 N.E.2d at 1094); *see also Liberty Mut. Ins. Co. v. Westfield Ins. Co.*, 703 N.E.2d 439, 443 (Ill. App. Ct. 1998) ("The phrase 'arising out of' is broad and vague and must be liberally construed in favor of the insured; accordingly, 'but for' causation, not necessarily proximate cause satisfies this language."); *Elec. Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 346 F. Supp. 2d 958, 966 (N.D. Ill. 2004) (same).

In short, "the phrase connotes a causal relationship rather than an incidental or fortuitous confluence of facts." *See Atain Specialty Ins. Co. v. Greer*, 182 F. Supp. 3d 873, 877 (S.D. Ill. 2016).

But the phrase "arising out of" requires more than creating a condition. "Even if an indemnitor creates a condition that set the stage for the injury, if the injury is unrelated to the indemnitor's contract performance covered by the indemnity agreement, the indemnitor will not be required to indemnify." *See DeMyrick v. Guest Quarters Suite Hotels*, 951 F. Supp. 138, 141 (N.D. Ill. 1997) (interpreting the phrase "arising out of").

For all its breadth, the phrase "arising out of" doesn't hold a candle to "associated with." The parties do not address the meaning of that phrase. The phrase "associated with" means that there is a connection or a relationship of some kind. *See Associate*, Black's Law Dictionary (12th ed. 2024) ("To connect or put together mentally; to view as somehow related"); *Associate, Merriam-Webster's Collegiate Dictionary* (11th ed. 2003) ("to join or connect together" or "closely related esp. in the mind"); *Associated*, New Oxford American Dictionary (3d ed. 2010) ("connected with something else").

That's plenty broad. But to underscore the point, the parties added the phrase "in any manner." That is, Davey must indemnify ComEd for losses "in any manner associated with" Davey's work. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 1 (Dckt. No. 112).

The parties offer starkly different takes on whether the accident arose out of Davey's conduct, or was associated with Davey's work.

On the one hand, Davey argues that it performed an adequate inspection. As Davey tells it, the tree did not violate ComEd's vegetation guidelines, so there was no need to report a deficiency in Asplundh's work.

Davey contends that the tree didn't pose a hazard within the meaning of the vegetation management program. For example, Davey points to testimony from ComEd's manager of vegetation management (Kevin Jury), who testified that the tree wasn't a hazard and didn't violate ComEd's guidelines. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 62 (Dckt. No. 101). By the look of things, Davey doesn't dispute whether the tree was dead, but it does take issue with the notion that the tree needed to come down.

On the other hand, ComEd contends that Davey dropped the ball and botched the inspection. ComEd argues that Davey should have reported multiple deficiencies. According to ComEd, the tree was dead, and was too close to a power line. Multiple abrasions suggested that the tree had come into contact with the power lines, too.

In particular, ComEd points out that Asplundh included a tree at that property on its Concern Log because it was "less than two feet from a primary power line." *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 24 (Dckt. No. 105). Asplundh listed that tree as an "established lead," so ComEd thinks that Davey should have spotted the problems and reported a deficiency.

Overall, the record includes a jumble of facts, and those facts raise unanswered questions. The parties sharply disagree about whether the tree posed a hazard and violated ComEd's vegetation management guidelines. The parties cite conflicting testimony from experts and fact witnesses. There is evidence on both sides of the scale, so a jury will need to sort it out.

The same conclusion applies to the broader question at hand, namely, whether the accident arose out of, or was associated with, Davey's work. Again, the indemnification provision does not require proximate causation. *See Maryland Cas. Co.*, 466 N.E.2d at 1094. The phrase "arising out of" requires only but-for causation. *Id.*

On this record, a reasonable jury could conclude that Davey's (alleged) negligence was the but-for cause of the accident. If Davey had assessed a deficiency, then maybe the tree would have come down.

Granted, that outcome wasn't a sure thing. Other actors had something to say about the potential removal of that tree. Asplundh or ComEd could have pushed back, or maybe Osornio wouldn't have allowed the removal of the tree, either.

So, the tree might have stayed put, even if Davey had performed a world-class inspection and flagged a deficiency. But by doing nothing, Davey ensured that the tree stayed put.

Again, there isn't enough in the record to establish proximate causation, given the long chain of intervening events. But the indemnification provision didn't require proximate causation. But-for causation is enough to establish a loss "arising out of" Davey's negligence. On this record, maybe but-for causation is a stretch, too, given the number of possible outcomes. But that's up to the jury.

What's more, the indemnification provision covered more than losses "arising out of" Davey's work. The provision also covered losses "in any manner associated with" Davey's work. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 1 (Dckt. No. 112).

An association is a connection or a relationship. It doesn't have to be a *causal* relationship. The phrase "associated with" is broad, and the parties doubled down on the breadth by adding the phrase "in any manner." That expansive phrase underscores the breadth of the provision.

On this record, a reasonable jury could conclude that the accident was associated with Davey's work. Davey failed to assess a deficiency, so the tree continued to stand, and laid the groundwork for the calamity that followed. Maybe a jury will find that the connection was too attenuated, but that's up to them.

In sum, the Court denies both motions for summary judgment on the applicability of the indemnification provision to negligence by Davey. On this record, there are genuine issues of material fact about whether the accident and the settlements arose out of, or were associated with, Davey's work.

### B. Indemnification for ComEd's Negligence

The last remaining issue is whether the indemnification provision requires Davey to indemnify ComEd for ComEd's own negligence.

Courts turn a skeptical eye whenever a negligent party asserts a right to indemnification for its own negligence. Maybe the skepticism comes from the fact that it seems counter-intuitive to give someone else a get-out-of-negligence-free card. And as a policy matter, receiving indemnification after committing negligence has its downsides. Removing the financial cost of negligence can lessen the incentives to exercise reasonable care, and that's not good for anyone.

For that reason, courts impose a clear-statement rule when it comes to receiving indemnification for negligence. "[B]ecause an agreement to indemnify a party for its own negligence is so unusual and extraordinary, the intent to indemnify to that extent must be beyond doubt by express stipulation." *See Blackshare*, 857 N.E.2d at 746; *see also Hankins v. Pekin Ins. Co.*, 713 N.E.2d 1244, 1248 (Ill. App. Ct. 1999) ("This court has recognized that an indemnity contract will not be construed as indemnifying one against his own negligence unless such intention is clearly and explicitly or unequivocally expressed in the contract."); *McNiff v. Millard Maint. Serv. Co.*, 715 N.E.2d 247, 249 (Ill. App. Ct. 1999) ("Illinois courts have consistently held that indemnification contracts will not be construed as indemnifying against a party's own negligence unless such construction is required by clear and explicit language of the contract, or such an intention is expressed in unequivocal terms.").

Sometimes indemnification provisions will say that a party has a duty to indemnify if that party (meaning the indemnitor) causes a loss. In those situations, the duty to indemnify is limited to the losses caused by the indemnitor. Courts do not extend the duty to indemnify to cover losses caused by *other* parties.

For example, in *Hankins*, Rudolf Express Company brought a claim against Hankins for indemnification for Rudolf's own negligence. *See Hankins*, 713 N.E.2d at 1245–46. The contract required Hankins to indemnify Rudolf for any damages "which might arise out of the performance of any work to be performed hereunder by Hankins, including all damages for bodily injury, illness, death, property damage, and cargo loss, *caused* in whole or in part *by Hankins's negligent act or omission* or noncompliance with any part of this contract or that of anyone employed by Hankins." *Id.* at 1246 (cleaned up; emphasis added).

The court held that Hankins had no duty to indemnify Rudolf for *Rudolf's* negligence. After all, the provision covered losses "caused in whole or in part by Hankins's negligent act or omission." *Id.*

Another case landed in the same place. In *Blackshare*, Southern Illinois Power Cooperative (SIPC) asserted a right to indemnification against Keith Martin, Inc. *See Blackshare*, 857 N.E.2d at 744. SIPC wanted indemnification for SIPC's own negligence. But that claim went nowhere, because the contract required indemnification for losses "due to the negligent acts or omissions of [Keith Martin]." *Id.* at 746.

But sometimes contracts use broader language. Sometimes contracts impose a duty to indemnify without limitation. That is, sometimes contracts do not tie the duty to indemnify to whether a particular party caused the loss. In those cases, Illinois courts hold that a blanket duty to indemnify includes a duty to indemnify the other party, even if that other party (meaning the indemnitee) caused the loss.

As an aside, one wonders if that approach is consistent with the clear-statement rule, which requires an express statement that the non-negligent party must indemnify the negligent party. It is one thing for a provision to include a blanket duty to indemnify. It is another for a provision to include a blanket duty to indemnify *and* expressly require a party to indemnify a negligent party for that party's negligence. But this Court takes Illinois law as it finds it.

In *Buenz*, China Ocean Shipping Company Americas, Inc. (COSCO) brought an indemnification claim against Frontline Transportation Company. *See Buenz*, 882 N.E.2d at 527. The contract provided that "Frontline shall indemnify COSCO for any and all claims arising out of, in connection with, or resulting from the possession, use, operation, or returning of the

equipment during all periods when the equipment shall be out of the possession of COSCO." *Id.* at 534 (cleaned up).

The Illinois Supreme Court looked at the unqualified language and found a duty to indemnify. The language of the contract imposed a blanket duty to indemnify, without limiting the right based on who caused the loss. Nothing in the contract suggested that Frontline's duty to indemnify COSCO went away if COSCO was negligent. "Frontline did not agree to indemnify COSCO for any and all claims arising out of Frontline's negligence. Instead, Frontline agreed to indemnify COSCO for any and all claims arising out of the possession, use, operation or return of the equipment." *Id.* (cleaned up).

In *Hussar*, Thorton Tomasetti, Inc. asserted a right to indemnification against Brewster Condominium, even though Tomasetti caused the harm. *See Hussar v. Brewster Condo. Corp.*, 2018 WL 3130844, at *1 (Ill. App. Ct. 2018). The contract required Brewster to indemnify Tomasetti for "any and all claims arising out of Brewster's negligence, the negligence of any contractor hired by Brewster, or the negligence of any other party." *Id.* at *5.

The court held that Brewster had a duty to indemnify Tomasetti for Tomasetti's own negligence. After all, the provision covered "negligence of *any other party*." *Id.* (emphasis added). That open-ended language was broad enough to cover Tomasetti's negligence.

Against that backdrop, the meaning of the indemnification provision between ComEd and Davey comes into sharper focus. The contract does not impose a blanket duty to indemnify, no matter what.

Instead, the contract requires Davey to indemnify ComEd for losses "arising out of any act, omission, conduct, negligence or breach by [Davey] and/or arising out of or in any manner associated with the Work under these Terms and Conditions." *See* Defs.' Resp. to Pl.'s

Statement of Facts, at ¶ 21 (Dckt. No. 105) (emphasis added); *see* Davey-Exelon Agreement, at 1, 7–8 (Dckt. No. 85-1). Again, the contract defines "the Work" as "all Material, Services, and Submittals required to be provided by [Davey]." *See* Davey-Exelon Agreement, at 13 (Dckt. No. 85-1).

The contract ties the duty to indemnify to the conduct of Davey. The losses must arise out of Davey's acts or omissions, or arise out of or be associated with Davey's work. Everything suggests that Davey must indemnify ComEd if Davey caused the loss. Nothing suggests that Davey has a duty to indemnify ComEd for losses caused by ComEd.

True, at the tail end of the indemnification provision, the contract does include a reference to ComEd's negligence. Davey has a duty to indemnify for losses arising out of its acts or omissions, "regardless of whether any such liability, damage, loss or injury is alleged to be caused by, result from or arise out of the negligence, fault or other liability of [ComEd]." *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 21 (Dckt. No. 105).

The key to that provision is the word "regardless." The provision does not expand the scope of the indemnification provision. Instead, it explains it. Basically, if Davey creates losses through its acts or omissions, then it has a duty to indemnify, and that duty does not go away even if ComEd also contributed to the loss.

But there's a caveat. The contract also includes a separate provision entitled "Limitation on Indemnity." It provides that ComEd will not lose the right to indemnification if it acted negligently and contributed to the loss, "except to the extent it is finally adjudicated that any liability is caused by or resulting from the sole negligence of [ComEd]." *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 1 (Dckt. No. 112). So, if the "sole negligence" of ComEd caused the loss, then Davey has no duty to indemnify.

The Illinois Court of Appeals interpreted a similar indemnification provision and reached the same conclusion. *See ABM Janitorial Servs. v. MB Real Estate Servs., LLC*, 2011 WL 1006859, at *11 (Ill. App. Ct. 2011) (cleaned up). That contract required ABM Janitorial Services to indemnify MB Real Estate Services for claims "arising out of, based upon, or occasioned by or in connection with ABM's performance of the Contract duties." *Id.* at *11.

That agreement also had a provision stating that "MB's right to indemnification shall not be impaired or diminished by any act, omission, conduct, misconduct, negligence, or default of MB or any employee of MB who contributed or may have alleged to have contributed thereto." *Id.* (cleaned up).

The court held that the latter provision did not expand the scope of the duty to indemnify, and did not require ABM to indemnify MB for MB's own negligence. Instead, "[t]his language merely provides that in the event MB's actions are found to be negligent, MB's own negligence will not impair MB's ability to recover under the indemnification provision from ABM for ABM's own negligence." *Id.* The language was "further evidence of the parties' intent to limit ABM's indemnity obligation to its own negligence rather than extend coverage of the indemnity obligation to MB's own negligence." *Id.*

In sum, the contract does not require Davey to indemnify ComEd for ComEd's own negligence. Davey has a duty to indemnify ComEd for losses arising out of Davey's acts or omissions, or arising out of or associated with Davey's work. That duty to indemnify does not disappear if ComEd also contributed to the losses, unless ComEd's sole negligence caused the losses.

**Conclusion**

For the foregoing reasons, the Court denies ComEd's motion for partial summary judgment. The Court grants in part, and denies in part, Davey's motion for summary judgment. Specifically, the Court grants Davey's motion for summary judgment on the breach-of-contract claim (Count II) and on the tort claim under the Contribution Act (Count III). The Court denies Davey's motion for summary judgment on the indemnification claim (Count I).

Date: August 31, 2026

Steven C. Seeger
United States District Judge